Jones et al. v. Graham et al.

## JONES ET AL. V. GRAHAM ET AL.

1. **RES JUDICATA:** *Dismissal of suit before trial on merits.*
   Under our statute the dismissal of a suit before submission on its merits, must, in the absence of proof to the contrary, be presumed to have been without prejudice to the right to renew it.

2. **COST:** *In equity, subject to discretion of court.*
   In equity the burden of cost is always subject to the discretion of the Chancellor, and does not necessarily fall upon the party failing.

3. **CHANCERY JURISDICTION:** *As to settlements of administrators.*
   A court of equity has power to vacate allowances to administrators obtained by fraud, accident, or mistake, in their settlements in the probate court, but none to correct mere errors in allowances, however gross.

4. **ADMINISTRATOR:** *Laches in collecting note secured by his intestate.*
   An administrator owning a note upon which his intestate is surety, is clothed with a trust that binds him to reasonable diligence to collect it from the principal; and if he willfully omit to collect when he can, and the principal afterward become insolvent, the estate will be discharged from the debt.

5. **SAME:** *Credit for confederate money.*
   An administrator should be credited in his settlement with the amount of confederate money received by him for the estate when current, and left on his hands after the war.

| | |
|---|---|
| 36 | 383 |
| 54 | 637 |
| 36 | 383 |
| 58 | 97 |
| 36 | 383 |
| 63 | 452 |
| 36 | 383 |
| 85 | 143 |
| 36 | 383 |
| 86 | 280 |
| 86 | 614 |
| 87 | 147 |

6. SAME: *Buying property sold to pay a debt due intestate, holds as trustee.*
If an administrator purchases land sold at a trust sale for a debt due his intestate, he holds the land as trustee for the benefit of the estate; and the probate court has no power to denude him of the trust, and allow him to hold it as his own and account to the estate for the amount of his bid. But the heirs and distributees can elect to hold him to his purchase, or to take the land and allow him his bid. This right, however, may be waived and lost by their neglect to object in the probate court, to his settlement there, charging himself with the amount of the bid.

7. SAME: *Notice of his settlements.*
All persons interested in the settlement of an administrator are charged with notice of its filing.

APPEAL from *St. Francis* Circuit Court in Chancery. Hon. J. N. CYPERT, Circuit Judge.

*B. C. Brown,* for appellants:

Administrator not entitled to interest on his own claim against an estate in his hands. *Seldon v. Preston,* 11 *Bush.,* 191; *Bigler v. Walker, Chase's Dec.,* 316; *Hall v. Denckla,* 28 *Ark.,* 506, 511.

Failure to sue Dobson released the estate of the surety. *Chambers' Appeal,* 11 *Pa. St.,* 436; *Tuggle v. Gilbert,* 1 *Duval,* 340.

Probate court could not confirm purchase by an administrator. *Michaud v. Gerod,* 2 *Howard,* 558; *Osburne v. Graham,* 30 *Ark.,* 66; *Fiscue v. Lyon,* 55 *Ala.,* 440.

Administrator not entitled to commissions on value of land and slaves. *Gullet v. Lamberton,* 1 *Eng.,* 109, 117. See, also, the following *Arkansas Reports:* 13, *pp.* 45, 48; 22, *p.* 64; 25, *p.* 499; 27, *p.* 235; 30, *p.* 775; 31, *p.* 576. See, also, *Statutes.* Nor upon property delivered to the widow as dower. *Arkansas Reports:* 4, *p.* 608; 8, *pp.* 40, 42; 14, *p.* 421; 17, *p.* 584; *Gantt's Digest, secs.* 121, 125.

Former decree of dismissal was not upon merits, and no bar. *Hoffman v. Porter*, 2 *Brock.*, 156 ; *Badger v. Badger,*, 1 *Cliff.*, 237 ; *Rosse v. Rust*, 4 *John. Ch.*, 300.

*Weatherford & Estes*, for appellees :

The former decree bars. It is always considered *on merits* where there has been a full answer and no reservation in the decree itself. It was in this case by consent. *French v. Shotwell*, 6 *John. Ch. R.*, 235 ; also, 5 *ib.*, 554 ; *Wall v. Busby*, 1 *Bro. C. C.*, 487; *Stuson v. Ashley*, 5 *Russell*, 4 ; 3 *Barb. Ch. Repts.*, 343; 2 *Barb. Sup. Ch. Rep.*, 596–7 ; 12 *N. Y.*, 188 ; 2 *N. Y.*, 114, 115 ; *Freeman on Judgments*, 262, 263 and 270 ; *Bigelow on Estoppel*, pp. 16, 17; 25 *Grattan*, 387 ; 47 *Cal.*, 545, 548; 2 *Smith's Leading Cases*, 667 ; 4 *John. Ch. Rep.*, 142 ; 26 *Penn. St.*, 78 ; 6 *Ohio,*. 409 ; 1 *Gray (Mass.)*, 413 ; 99 *Mass.*, 39 ; 6 *J. J. Mar.*, 538 ; 5 *Allen*, 378 ; *Durant v. Essex Co.*, 7 *Wallace U. S.*, 109, and cases cited. *Lawson v. Bettison*, 12 *Ark.*, 401 ; *Jamieson v. May*, 13 *Ark.*, 600; *Barton v. Hynson*, 14 *Ark.*, 32. Original jurisdiction of probate court on settlements, exclusive. *Reinhardt v. Gartsell*, 33 *Ark.*; *West v. Waddell*, 33 *Ark.* Between citizens of the same state interest ran during the war. *Gates v. Union Bank*, 12 *Heisk.*, 325 ; *McGaughey v. Berg*, 4 *Heisk.*, 695.

Administrator not liable for delay in suing, if he acts in good faith; nor for want of judgment in his attorney. 11 *Ark.*, 212; 12 *Heisk.*, 79.

Lands and slaves made *assets sub modo*, and liable to commissions as personalty. But, if erroneous, the mistake should be corrected on appeal.

No fraud in the purchase by the administrator at trustee's sale. *Lyons v. Jones*, 6 *Humph.*, 534; *Coffee v. Ruffin*, 4 *Cald.*, 514; *Murdock's case*, 2 *Bland*, 468; *Meath v. Porter*, 9 *Heiskell*, 224.

25—36

Courts will ratify what they would direct to be done. *Perry on Trusts*, secs. 458, 476 ; *Roseboro v. Roseboro*, 3 *Jere Baxter* (*Tenn.*), 314 ; *Foscue v. Lyon*, 55 *Ala.*, 455 ; *McCarthy v. Steam. Press Co* , 5 *Lou.*, 16 ; *Tenley v. Hoyte*, 3 *Cooper's Chancery*, 569, and cases cited.

*B. C. Brown*, for appellants, in reply :

Former decree not on merits, when no reason is given, and it is not in the nature of a retraxit. *Wright v. De- Rlym*, 1 *Pet. C. C. R.*, 205 ; *Hoffman v. Porter*, 2 *Brock.*, 156 ; *Badger v. Badger*, 1 *Clifford*, 239 ; *Bond v. McNider*, 3 *Iredell Law*, 440 ; *Wadham v. Gay*, 73 *Ill.*, 415 ; *Louden- bach v. Collins*, 4 *Ohio St.*, 251.

Binding decrees against infants must be rendered on *proofs*. 27 *Ill.*, 145 ; 1 *Ind.*, 374; 4 *Md. Ch.*, 278; 33 *Mo.*, 101. Not by consent of attorney. 36 *Mich.*, 124, and cases cited; 22 *Pa. St.*, 337.

## STATEMENT.

Eakin, J. William A. Jones, a citizen of St. Francis county, died intestate on the seventh day of December, 1860, leaving a very valuable estate, consisting of lands, slaves, personal property, and choses in action. His widow and five children survived him. Two of the latter have since died childless and intestate, and one, a daughter, leaving an only child. He, with the two surviving children of William A., are complainants in this suit.

Shortly after the death of Jones, letters of administration were granted defendant C. C. Graham, who gave bond, with defendant Eldridge and the two Mebanes as sureties. In January, 1861, he filed an inventory and appraisement of all the real and personal property. About the same time, on application of the widow and children, and upon show- ing that the lands and slaves would not be required for

debts, the widow's dower was set apart in all the lands and personalty; some of the slaves were ordered to be delivered to certain of the children as their own property; and the remaining lands and slaves were duly partitioned. The administrator was ordered to deliver all these over, out of the property inventoried and appraised; to ship the cotton on hand to Memphis; and to sell the same for the benefit of the estate. Upon this cotton, and the sale of some railroad stock, he received $13,067.06, early in 1861.

Graham was himself a creditor of the estate, holding a joint note executed by his intestate and one Dodson, for the sum of $2,443.92, bearing interest at the rate of 10 per cent. He presented this claim to the probate court, and it was allowed, amongst other claims of other parties, for its face and $325.84 interest, on the thirtieth of April, 1862.

During this year, he also filed his first settlement, which, in due time, was approved by the court. Very little or nothing more seems to have been done until after the war. Meanwhile, a great many of the records of St. Francis county were destroyed by fire. In October, 1865, he filed another settlement in lieu of the first, which was thought to be lost, and continued to file settlements in succession, down to about the year 1869, when he seems to have made a final settlement, and was discharged. Believing that his first allowance had been also destroyed by fire, he had his claim against the estate and Dodson again allowed as a demand, on the tenth of May, 1866; and on the thirtieth of July, 1867, upon suggestion of a mistake in the calculation of interest in the former allowance, he had the amount raised and reallowed for the gross sum of $4,289.75.

In 1870, the present complainants, being then all minors, sued defendant in chancery, seeking to surcharge and falsify his accounts. He answered the complaint fully. Both bill

and answers are exhibited, but the record of the judgment, or decree, was burnt, and no copy produced. The present complaint alleges that the former suit was brought by guardians; and, by them, dismissed, without hearing or decree upon the merits. The present defendants, in their answer, contend that the former suit was concerning and involved the same subject-matter; that upon the coming in of the answer, it was dismissed by plaintiffs; that defendant, Graham, upon said dismissal, agreed, on account of some admitted errors in his accounts, to pay the costs; and that he did so, and the judgment of dismissal was duly entered on the records of the court. Beyond these charges and admissions, the transcript affords no light as to the terms of the decree.

The present suit is a renewal of the same litigation. The complainants are the surviving heirs, and the defendants the administrator and his sureties. The bill charges various instances of conduct on the part of the administrator detrimental to the estate, which are alleged to have been fraudulent, as well as illegal. It is alleged generally, upon these facts, that his settlements were wholly fraudulent, and that their confirmation was procured by fraud; and they seek to open and restate the accounts all through, and hold the administrator and his sureties liable for the true amounts. The charges are specific enough, and are directly answered. The more important of them will be taken up in detail in the opinion, including only such as may be thought sufficient to decide the case, without meaning to be exhaustive, and without notice of many which seem to have been abandoned by counsel.

Upon hearing, the Chancellor dismissed the bill, at complainants' costs, for want of equity; and they appealed.

Jones et al. v. Graham et al.

## OPINION.

The first question presented, regards the former suit, pleaded as a bar. Under our statute, a plaintiff may, at any time, dismiss his suit without prejudice, before the final submission of it to the court, or a jury. *(Gantt's Digest, sec. 4638)*. There is nothing to show that this controversy was ever submitted, in any way, to the court, in the former suit. It can not be inferred from the judgment against defendants, then, for costs. There is no proof of any valid agreement to dismiss the suit for a consideration. The question has been much argued by counsel, on both sides, in their briefs, with a considerable array of authorities on the part of defendants, but the whole matter seems settled by statute. The dismissal before submission upon the merits, must be presumed to have been intended without prejudice. We are cited to the case of *Merritt v. Campbell, 47 California, 543*, as in point to sustain the defense. It suffices to answer that there was a submission for trial in that case, and findings upon an agreement. The circuit judge was not precluded from hearing this case upon its merits. There may have been some special ease or advantage to the defendants in having that case to cease; and even if the guardians prosecuting it, had been authorized to compromise it upon the merits, and bind their wards by a contract not to renew the suit, no such contract is shown.

In equity the burden of costs is always at the discretion of the Chancellor, and does not necessarily attach to the party failing. There is no reason why he may not, by consent, impose them on defendants, even when a suit is dismissed under such circumstances as not to prejudice the right to renew it.

In the case of *Reinhardt v. Gartsell, 33 Ark.*, this court upon mature deliberation, and a review of previous cases in connection with the constitution of 1874, endeavored to

*Marginal notes:*
1. RES JUDICATA: Dismissal of suit before trial on merits, presumed to be without prejudice.

2. COST: In equity, subject to discretion of court.

lay down clearly the principles upon which courts of chancery may interfere with settlements duly approved by the probate court, from which no appeals have been taken. Subsequent thought has strengthened the court as to the soundness of its views therein expressed. Any general extension of chancery powers to correct errors of the probate courts would not only be out of harmony with our judicial system, but would be the prolific source of wrong and injustice to many honest representatives who may have rested for years upon their settlements, as approved by the courts; and lost the memory, or means of proof, of various complicated transactions essential to their proper credits. Courts of chancery are not courts of probate, nor courts for the correction of errors. They interfere with the judgments of *any* courts, of whatever nature, to rectify any wrong inflicted by fraud, or to relieve against the consequences of accident or mistake, but they invade the territory of other jurisdictions no further than may be necessary to accomplish their legitimate objects; and, having done that, retire.

The court is not insensible, nor forgetful of the evils and dangers resulting, or to be apprehended, from the incompetency, weakness and infidelity of county judges, holding probate courts. These evils and dangers are everywhere patent, and have brought upon the chancery court a pressure to assume their duties. It is the duty of this the supreme supervisory court of the state, to keep the courts of original jurisdiction to their appointed ambits; and on its own part to resist the temptation to correct by judicial decisions, crying evils in the constitutional adjustment of judicial powers. Until the laws are changed, the true remedy lies with the people, in a more careful selection of county judges; and with those interested in estates, in a more careful observance of their proceedings, and in

prompt appeals from errors. The family friends of infants. must see to it that proper guardians are selected, and that they are held to reasonably fair account. It can not be permitted that parties interested in estates, or solicitous. for the welfare of minors, shall lie supine until administrations are closed, and then appeal to the chancery courts for relief, on account of mere errors or improper allowances, against the sureties who have rested securely, as they had a right to think, upon the judgments and orders of superior courts of record.

Adopting then, and reaffirming with emphasis, the principles of the case above cited, it devolves upon us to examine what frauds have been shown, and wherein; what mistakes have occurred, or accidents happened, within the scope of the allegations, or the purview of the prayer for general relief; and correct them as they affect the accounts, or charge property in the private possession of the administrator with equities; and having done that, to leave all other matters untouched which have been settled by the probate courts, however erroneous in law. Some of the charges made in the bill are not pressed by attorneys nor sustained by proof. It will be sufficient to notice only the points presented in the very clear and able briefs of the attorneys on both sides.

All the allowances on the note of Dobson and the intestate in favor of Graham, except the first, were obviously made by mistake. There is also a mistake in the calculation of interest in Graham's favor of several hundred dollars. The Chancellor should have set aside all subsequent allowances, leaving the first only to stand for the sum of $2,767.75 with interest at the rate of ten per cent. per annum, from April 30, 1862. Even this gross amount embodies more than a year's accumulated interest, and the allowance being *in solido*, compounds it. We do not wish

to be understood, here, as deliberately approving this prac-
tice in the probate courts; but, if wrong, it was only error.

**4. ADMINIS-**
**TRATOR:**

*Laches* in
collecting
note se-
cured by
intestate.

Following, for convenience, the transactions on the part
of Graham with regard to this debt, it is charged upon him,
as · fraudulent, that the intestate was only the surety of
Dobson, which Graham well knew, and that it was the
duty of the latter, representing Jones' estate, to have taken
means to collect it of Dobson who was solvent; as Jones
might, if living, have compelled him to do so; or might
have taken up the note and sued Dobson for exoneration,
or filed a bill for the purpose. That Graham had put him-
self in Jones' position and was bound by his trust to take
measures against himself to secure the exoneration of the
estate, so far as it might have been done by reasonable dil-
igence to collect from Dobson; to have done, in short, what
any third person might and should have done, representing
the estate; and that it was a fraudulent dereliction of duty
to rest upon the estate, which he controlled, and let Dobson
escape.

There is much force in this view. A deliberate design
of this sort would certainly be in fraud of the trust, and
should deprive Graham of the benefit of his allowance alto-
gether. He had a right in any case, whether Jones was
a surety or principal, to collect off the estate; but if Jones
was surety his right would depend on his observance of all
things required by law, and in equity, of creditors in their
treatment of sureties. Being surety himself in his charac-
ter of administrator, for a debt due himself individually, he
should be held to every observance towards the principal
which a surety could exact of a creditor.

It is denied, however, that Jones was surety. He does
not appear such on the face of the note, and the proof
tends to show that it was a joint note for a joint debt. In
this aspect, the principles of exoneration do not apply. It

becomes a case of contribution between principals. The estate was primarily liable to Graham for the whole debt, equally with Dobson; and Graham was entitled unconditionally to his full allowance. He was entitled, however, to but one satisfaction, and it was his duty, as administrator, to so manage as to collect a half of it from Dobson ultimately, not as a condition of his own satisfaction of the whole out of the estate, but upon the principle which imposes upon him the duty in all cases, to collect in the assets with due diligence. A failure to do this might be fraud, or only waste, for which he would be liable, as in other cases of waste for negligence. The allegations of the bill, with the prayer for general relief, are broad enough to cover relief on this ground, and this requires a more particular notice of the circumstances.

The allowance in 1862 was made whilst the war was flagrant. Although the courts had not then closed, their business was greatly interrupted, and soon ceased altogether.

It is not probable, under circumstances of which the court takes notice as matter of public history, that the suit could have been then pressed to collection; nor was it clearly Graham's duty to attempt it.

Suit was begun in March, 1866, upon which judgment against Dobson was recovered in April, and execution issued in August, which was returned, by order of the plaintiff, without levy. A second execution issued on the tenth of March, 1868, upon which the sheriff returned that he had made a levy upon lands; which, on account of informality of notice, were not sold. Whereupon a third execution issued August 3, 1868, which was levied upon certain lands, in all, 697 acres, which were sold, and bought by the plaintiff for $18. In explanation, Graham, in his answer, denies that Dobson was solvent after the judgment,

and says the land sale was delayed on account of hesitation about Dobson's title, and that no personalty could be found subject to execution. He says that he never claimed the lands as his own, on account of the bid, but has ever held them for the use of the estate, or such of them as were worth preserving, and offers now to convey them on reimbursement for taxes paid. The small sum for which he bought does not appear in his settlements, and considering that a part, at least, must have gone for costs, it would be too small of itself to notice.

The evidence renders it very doubtful whether any more could have been recovered of Dobson by the extremest diligence; and shows, also, that Graham left the matter to the judgment of his attorneys, who seem to have acted in good faith. The conclusion is, that in his management in the collection of the Dobson claim, there was no fraud shown against the estate, nor such laches as should hold him liable for waste.

He acknowledges, in his answer, however, that he did collect of Dobson a certain sum of $600. He should have charged himself with this, by way of contribution, in favor of the estate, against which the joint debt had been allowed in full. Nothing of it appears in any of his settlements. This, unexplained, would be fraudulent. He attempts an explanation in his fourth settlement, which will be hereafter considered.

The answer concedes that the lands, purchased under the Dobson execution, may be considered as held by him for the use of the estate. Upon this voluntary offer, it would have been proper in the Chancellor, if complainants had in any proper manner indicated an acceptance of it, to have an account of the lien held by Graham for taxes and expenses with regard to the lands, and allowed complainants to take them upon payment; or, if desired, he might have

directed a sale for the payment of the lien, and the distribution of the proceeds. They may be worthless, however, and it was not the duty of the Chancellor to grant this relief without some amendment of the complaint with that view; or, at least, a motion to that effect.

Taking the settlements in order, beginning with that of 1865, it is charged, as fraudulent, that he claimed and was allowed commissions upon the whole appraised value of the slaves, including not only those taken for dower, but also those which had been given up to others as no part of the estate. The allowance was large and of very doubtful propriety, under the circumstances; as the slaves were soon given over to their owners, as dower or on partition. But the claim was openly made, and submitted to the court as a matter of right, without any concealments, undue influence, or improper artifices to mislead. However erroneous it may have been there are none of the marks of fraud.

Several claims for credit in this settlement, supported only by the affidavit of the administrator, showing that he had made the payments and lost the vouchers, are contested as fraudulent. It was soon after the war, during which many papers were lost, and the court deemed the evidence sufficient. There is no proof of actual fraud, or unfair intention.

It is admitted that there was, by mistake, an excess of credit of $100 in the value of the slaves; and of $100 in payment made to Cook & Co. These were proper subjects of chancery jurisdiction and should have been corrected.

A credit of $125 was allowed for money handed to an attorney to pay taxes upon lands in Crittenden county without any proof that the taxes were paid. The court should never have allowed such a credit without a better showing, but as it is not to be questioned that the administrator did give the money to the attorney, for the purpose indicated,

Jones et al. v. Graham et al.

the case is simply one of error, that should have been corrected on appeal.

5. ———: The probate court, upon the special petition of the
Credit for
confederate administrator, showing that he had, during the war, been
ate money.
constrained to take confederate money; that he had left on his hands more than he had been able to use, the sum of $1,025, including $300 which he had turned over to the widow, as guardian, and which she had been unable to use also; made an order that he should be allowed that credit, to be deducted from the balance on his first settlement. This order was made at the time of the confirmation of the settlement, and the claim for this credit did not appear in the settlement filed and laid over. The action of the court was grossly erroneous and irregular, although the claim was a meritorious one, if properly made and sustained. The settlement showing the balance chargeable, had been filed at the October term 1865, at which time all confederate money had become as worthless as the dead leaves of summer. It was in Graham's hands then, if at all. No reason is shown why he had not claimed it at the time of his settlement filed for confirmation. The action of the court upon the petition was simply, however, to permit him to take credit for the amount so allowed, "in his annual settlement with this court, of the estate of said deceased." It had a future reference, and the credit was not actually entered upon the settlement of October, then pending and unconfirmed. At his next settlement the administrator charged himself with the amount of the previous settlement, "after deducting from the balance appearing upon the face of his settlement the sum of $1,025 allowed by the court upon confirming said settlement, as appears by the records of this court."

In the case of *Burke, Guardian, v. Coolidge & Horner, Admrs., 35 Ark., 180,* this court held, with regard to a sim-

ilar order, made, on a petition of administrators to be allowed credits, out of time, that the statute regulating proceedings in the probate court did not authorize it, and that such an order, being improvident, did not have such force, as *res judicata*, as would preclude those interested in the estate from questioning the propriety of the matters credited, when they should be thereafter claimed in a formal settlement prescribed by statute.

All the matters concerning this confederate money, might, on this view, have been raised by exceptions to the next settlement, wherein this credit was claimed, simply by objecting that the balance with which the settlement began was not the true one. This was not done, although it lay over, for confirmation, the prescribed time. It is now well known, and recognized by this court, that during the greater part of the civil war, this confederate money, of the state, and the southern confederacy, was the only money in circulation, and the only medium for the transaction of business, which everybody was compelled to take in satisfaction of debts, under a strong social, if not military, coercion, which excused them from accountability beyond its true value, in receiving this currency. Hence, if the court were reasonably well satisfied that the money had been received as represented, and had died in Graham's hands, without his fault, or in that of the widow, before she could use it, there was nothing inequitable in the allowance; and, however irregular the order may have been, the subsequent confirmation was according to the prescribed methods of proceeding. The irregularity of the petition and allowance, after the reticence with regard to this money in the former settlement, would raise a suspicion of fraud, but that the matter remained a long time open to question, and no objection was actually made. The request for this credit was a reasonable one. The court will be presumed to have

acted on sufficient advice. It confirmed the credit afterwards, and there is no proof of any conduct on the part of Graham to mislead the court by any false statements. Whilst we condemn and deprecate such looseness in the probate courts, we can not say that the allowance was either fraudulent or made through mistake.

This second settlement was filed on the twenty-eighth of January, 1867, and laid over until the twenty-fifth of April, 1867. No exceptions were made to it, and none are now pressed upon our consideration, except that the errors of the first affect the balance.

We pass to another of those interlocutory orders, between settlements, affecting the liability or exoneration of the administrator. Courts of probate, on their part, find it hard to realize that they are not courts of full equity powers; and that their jurisdiction over estates of deceased persons, to administer them, although exclusive, is directed by statute into prescribed channels of procedure.

6. ———: Buying property sold at trust sale for debt due estate, holds as trustee. At the next term of the probate court, in July, the administrator reported that there had come into his possession a deed of trust of certain lands, executed in 1860, by one Sullivan, to George W. Beasly, to secure to the intestate a debt of about $5,500. That he had directed the trustee to sell under the power; that he had attended the sale, and finding the lands about to go below value, had himself bid the sum of $3,040, and the lands were upon that bid struck off, no one being willing to bid more. He represented that he had no desire to keep the lands, but was willing to hold them as property of the estate, if the court should deem it best; and submitted the matter to the court to say whether he should keep them as his own, charging himself with the net price, after paying expenses, or hold them, as administrator, for the benefit of the estate.

Upon this, the court was of opinion that the lands had

sold for what they were worth, and that it would be for the interest of the estate that Graham should keep them as his own, and account for the bid. The court so ordered, and directed, further, that he should receipt to the estate for the net proceeds of the sale, whatever that might be, upon the allowance against the estate of his own debt. In pursuance of this order, he, in his next settlement, filed in January, 1868, charged himself with the sum of $2,715.50, as proceeds of the sale. The lands have since become much more valuable, on account of the growth of the neighboring town of Forrest City, and the bill seeks to charge him with a trust of those lands in favor of the heirs of his intestate.

It is hard to imagine how fuller proof could be made of fairness of intention in this transaction. But the whole proceeding upon this report was unauthorized and irregular.

The first step which Graham should have taken on being advised of the existence of this deed of trust, was to file an additional inventory, showing the debt circumstantially, and charging himself with the full amount, as part of the choses in action which had come to his hands. He might then have applied to a court of chancery to have the deed of trust foreclosed under its directions, which might, if deemed advisable, have authorized him to bid on his own account, or on account of the estate. Or he might, as he did, have proceeded *in pais* to have the sale made, under the power, to the highest bidder. In either case, he would be held accountable only for the net proceeds of the sale, and if the balance of the debt could not be collected, he would be entitled to a credit of it in his accounts as desperate. But he did neither. He declined to apply to the chancery court for its directions and protection, and was unwilling to let the land go to the highest *bona fide* bidder, desiring to purchase. He took the risk of running it up

on his own account. His actual motives can not, under the circumstances, be questioned; yet, from public policy, he became clothed, upon the purchase, with a constructive trust, because of his use of the means of the estate in making the purchase, and also because of his fiduciary relation to the estate. His duty to that required him to encourage a sale at the highest price, and his individual interest, being supposed to prompt average men, would tend to induce him to purchase cheaply. He became clothed with the trust by operation of law, and was wearing it when he came into the probate court to ask, if deemed best, that he should be denuded, by accounting for the proceeds. It was a mistake of the tribunal. The courts of equity alone had power to do that, upon a direct application, and, acting properly, would not have done it, without all parties in interest before it. The application to the probate court was *ex parte*, and not connected with any pending settlement, nor made at a time when any one interested in behalf of the heirs could have thought it necessary to be in attendance, and the action of the court would have been improvident, if authorized. The order can not be considered as conclusive on any one, or as having any greater effect than mere advice as to the probable future action of the court upon his settlement, when the same should be made. He went out with the trust upon him, notwithstanding the order. This results directly from the ruling in *Burke v. Coolidge, etc., supra.* But it is of the essence of constructive trusts, that they are at the option of those entitled to claim the benefits. They may leave the property in the hands of the trustee, and accept the proceeds, in accordance with the legal title, and that election, deliberately and intelligently made, dispels the trust.

In his next settlement, as we have said, the administrator, in addition to the former balance, charged himself with

Jones et al. v. Graham et al.

the sum of $2,715.50, as "amount of net proceeds of deed of trust, on the west half of section twenty-eight, township five, north of range three east, sold by George W. Beasly, trustee." Upon this settlement the probate court had authority to act, and to adopt or reject this item. It was laid over for confirmation, and ordered to be advertised. No April term was held, and it lay over until the thirty-first day of August, a period of nearly six months, when it was taken up and confirmed without objection.

All persons interested in the action of the administrator to be affected by his settlement, are charged with due notice of its filing. They are required to follow the regular statutory proceedings of the probate courts and take notice of what may affect them. Administrations must, per force, go through these courts, and they would be attended with additional hardships, delays, and expenses, if special notice to every one interested was required. It is very true, and lamentable enough, that the interests of minors are often sacrificed by the indifference of friends and relatives in taking an interest in having proper guardians appointed; and by the negligence and indifference of guardians when appointed; and sometimes, though more rarely, the interests of *femmes covert* are lost by culpable negligence of husbands. But these are not altogether the results of the system, and if they were, it is for the legislature to change it. A truer and better remedy has already been indicated.

7. Notice of his settlements.

The probate court itself should of its own motion act intelligently upon settlements, keep careful watch upon administrators and guardians, and allow nothing without inquiry, which might be detrimental to heirs, distributees, or creditors.

In view of the obvious absence of all fraudulent intent, the length of time that the settlement lay unchallenged, and its final confirmation, we think the action of the pro-

26—36

bate court amounted to an election to take the proceeds, and discharge the trust. The administrator, against the charge, properly credited himself with the same amount as taken upon his own allowance against the estate.

Upon the same day, with the confirmation of the third settlement, he filed his fourth, which was ordered to be advertised for confirmation. No exceptions having been made it was confirmed at the next, or November term, 1868.

Waiving minor objections with the general remark that the matters complained of were only erroneous and not clearly fraudulent, we will notice one of graver character, made to a charge, in this settlement, of the administrator against himself. It is for "amount of interest collected on claims due said estate, and not heretofore charged" $1,868. This is accompanied by no notice, schedule or memorandum of the assets upon which the interest was collected, showing the amounts from each. The inventory had been verified by oath on the twenty-ninth of January, 1861, and embraced accrued interest on the notes, etc., up to that date, leaving for future charge against the administrator all subsequent accruing interest, which was, or should should have been by reasonable effort, collected. The inventory shows near about $9,000 of interest-bearing paper, without including the Sullivan debt not inventoried. Much of that is accounted for otherwise, or shown not to have produced interest, but there are no data given by which the court or any one else can know whether the amount charged be in fact correct. The accounts were prepared by an attorney who would doubtless have given the items if he had been furnished with them by the administrator.

This looseness attaches to this vague charge a suspicion of an attempt to elude investigation. It is the very ground

upon which fraud was predicated in *Stone et al. v. Ring-gold, 20 Ark., 526*, although the acts there were of a more aggravated carelessness. It is not consonant with the ordinary habits of business men to lump matters in this way without references for their verification. An additional shade falls upon this item from an explanation attempted by Graham. He accounts for $600 of it by saying it was money he collected from Dobson. This he had failed any-where to show in his settlements or reports, although it di-minished just that much his own claim against the estate. He says that amount was included in the sum of $1,868 charged against himself as interest. It was, to say the least of it, a singular mode of accounting, and with regard to this matter we may say, in short, that whatever may have been the real intention of the administrator, this item must be considered as constructively fraudulent, so far as it has any effect to limit his liability.

The matter should be referred to a Master, with direc-tions to charge interest upon all the interest-bearing paper included in the inventory after the twenty-ninth of January, 1861, according to the reported rates, and to add thereto the sum of $600 collected from Dobson; and to credit what-ever sums of interest may be shown not to have been col-lected, by reason of the inability of the administrator to make the collection; or from compromises approved by the court or from other good cause. The *onus* must be on the administrator to exonerate himself, since the necessity of the account does not spring from any error of the court, or mistake of any one, so much as from a failure on his part to make a full, fair and frank showing.

There are many allowances of an improper nature, espe-cially concerning attorney's and agent's fees; and, as al-ready noticed, commissions. The court seems to have been more liberal to the administrator than consistent with a

due regard to the rights of the heirs, and distributees. Yet these objectionable points, except as above stated, all range themselves under the class of errors. There is very little of a material nature which might not have been easily corrected at the time, or prevented, if the guardians of the children, or their mother, or any friend had taken an interest in their affairs. The errors should have been corrected by appeal or some other supervisory proceeding.

There are some admitted mistakes in excessive credits, amounting to $244.10, including the excess in value of slaves, and in the amount paid Cook & Co. These must be, of course, corrected. In other respects the accounts will stand as now approved by the court.

The court erred in dismissing the bill. The account must be taken below, for the correction of the mistakes as indicated herein, and the entire reopening of so much of the accounts as concerns interest upon debts due the estate, which was, or should have been received; and the sum of $600 collected of Dobson. Inasmuch, as the last sum should have been reported when received, the Master should be directed to charge the same interest upon that, which is borne by the administrator's allowance against the estate.

Complainants should be allowed to amend their complaint, if so advised, and tender or consent to allow all proper sums expended by the administrator for taxes or other proper expenditures upon the lands which he concedes he holds in trust; or to ask that the lands be sold for the benefit of the parties concerned and proceeds divided. Their value is probably small, but of this we can not determine.

Reverse the decree, and remand the cause for further proceedings consistent with equity and this opinion. The

costs of this court must be paid by appellee. The costs below will be in the discretion of the Chancellor.

### SUPPLEMENTAL OPINION.

Eakin J.  Upon a motion for reconsideration, the court has carefully and anxiously reviewed the foregoing opinion, especially that portion of it which holds Graham to be relieved from any constructive trust, with regard to the lands purchased under the Sullivan deed of trust.  The anxiety has arisen from a disposition to relax no part of that jealousy which courts of equity have always maintained towards persons dealing with property controlled by them in a fiduciary capacity.  We think, however, it would be absurd to press this to the extent of doing injustice to an administrator, who, however careless and culpable in other respects, seems in this to have been acting, not for himself, but for the interests of the estate, to have openly avowed his desire that some one else would buy, if only they would buy at a fair value; who at once reported the whole matter to the proper court, as he supposed, for directions; giving special information, and relinquishing all claim to any benefit of the purchase; and who was afterwards charged by the court, having jurisdiction to adjust his settlements with the money bid, as if he had been a stranger.  There are no authorities directly in point. The case is peculiar—not likely to arise again.  It is not like the case of an administrator or attorney who simply purchases for himself, with the design of acquiring the prop·erty, and who has the sale confirmed without question, or explanation of the circumstances.

Courts of probate certainly, as this court insists, are not courts of chancery, with any jurisdiction, generally, to confer equitable relief, nor have they the power to proceed according to the practice and methods of chancery courts

PROBATE COURTS: Have no chancery jurisdiction or practice.

even with regard to subject-matters within their jurisdiction. Their practice is statutory and must be followed. But with regard to these subject-matters, when properly brought before them, and in determining rights, they may sometimes, and often of necessity, must, apply equitable doctrines. If they do so advisedly, their action should not be wholly disregarded. The court does not mean to say that, ordinarily, the approval of a sale, or dealing with the proceeds by a probate court, would relieve a purchaser of a constructive trust. Ordinarily it would not. This case stands on its own peculiar grounds, with such distinctions from reported cases as will be sufficiently obvious.

Overrule the motion to reconsider.